UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 10-20798-CR-COOKE

UNITED STATES OF AMERICA,
              Plaintiff,

v.

JOSE SALAZAR BUITRAGO
JOHN FINKELSTEIN WINER,
              Defendants.
_____/

**DEFENDANTS' JOINT MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT CONDUCT OR, IN THE ALTERNATIVE, MOTION FOR MISTRIAL**

Defendants Jose Salazar Buitrago and John Finkelstein Winer, through undersigned counsel, hereby file this joint motion to dismiss the superseding indictment based upon the government's outrageous conduct. In the alternative, the Defendants move the Court for a mistrial based upon the government's misconduct as outlined below. In support of this motion, the Defendants state:

**FACTUAL BACKGROUND**

A.    Outrageous Government Misconduct- Overt Acts.

On April 3, 2013, counsel for Jose Salazar Buitrago made a joint *Brady* request on behalf of both Defendants, in writing (email can be provided upon request), requesting the following from AUSAs Andrea Hoffman and Cristina Maxwell:

> The DEA and other US law enforcement agencies utilize Vetted Units for overseas investigations. In Colombia, for example, this Vetted Unit would consist of a small number of Colombian law enforcement agents assembled by a US agency, such as the DEA to assist them in any investigations they have ongoing. Vetted Units are required to file periodic reports to justify expenses they incur, which are footed by the US agencies. The purpose of these units is to assist US law enforcement agents investigate crimes occurring overseas for which the US may seek extradition. This scenario, as we know, happens in Colombia. Please

>ask the DEA agents involved in this case about this request, and also their Colombian counterparts.  Please include any such units that had any involvement with our clients' cases, the names of theses individuals, reports produced, any evidence seized during their investigations and monies paid out by the US to these Units or their representative agencies.

Defense counsel received no response to the written request sent on April 3, 2013. Having received no answer, undersigned counsel followed up on April 30, 2012.  AUSA Hoffman replied she could not find the defense request sent on April 3, 2013 and asked for it to be resent, and the original request was forwarded again to the government. On May 1, 2013, the government finally responded to defense's second request with its own request.  The government demanded that the defense provide legal support in order to obtain the requested information, which it acknowledged existed and was contained in "reports." (All emails can be provided to the court upon request).  In response, defense counsel asked whether the government was refusing to turn over the requested information.  AUSA Maxwell then responded via email as follows (copying AUSA Hoffman and defense counsel for Mr. Finkelstein):

>If you really want to have a productive conversation on this, then tell me why it's *Brady*, or under what theory you are entitled to it.  Enlighten me.  If we agree, we'll certainly provide it. Or you can continue to send snooty emails!

In light of the government response dated May 1, defense counsel determined that a motion to compel filed with the Court was appropriate.  In that motion, defense counsel requested that the Court compel the government to produce the same information that had been requested of the government via email on April 3, 2013.  *See* Docket Entry No. 456.

This pretrial motion was litigated before the Court in the late afternoon on May 20, 2013, after jury selection had begun.  At that time, the Court inquired of AUSA Andrea Hoffman whether any monies were paid by the United States government to members of Colombian law

enforcement in connection with the investigation of this case. Ms. Hoffman responded that she was unaware of any such payments. Jury selection in this case was completed the morning of May 21, 2013, after which time opening statements were made. The government then called its first witness, Colombian National Police Officer Pacheco. During the cross-examination of Mr. Pacheco, it was revealed that he and other officers in his unit receive $200.00 per month from the United States Embassy in Colombia. Following the cross-examination of Officer Pacheco, the Court, *sua sponte*, excused the jury and conducted its own inquiry regarding such payments. During this inquiry, Officer Pacheco testified under oath that he does not have to give the United States an accounting of how he spends the $200 per month that he is paid by the United States, but he is encouraged to use that money to assist him in undercover investigations. The Court then excused the jury for the remainder of the afternoon and made further inquiry about this issue. The Court's inquiry ultimately revealed that when Ms. Hoffman represented to the Court on May 20, 2013 that she was unaware of any payments flowing from the United States to individual Colombian law enforcement officers and groups, she was less than truthful (see transcript of court's questioning of S/A Turke regarding 'bonuses') [p. 16, lines 12-22].

> The Court:   Were you ever asked about this prior to me asking you this afternoon?
> S/A Turke;   Was I ever asked, yes, ma'am.
> The Court:   When was the first time you were asked about it?
> S/A Turke:   Sunday, when we came in. We flew in from Colombia.
> The Court:   Who asked you?
> S/A Turke:   The prosecutor.
> The Court:   Which prosecutor.
> S/A Turke:    Andrea Hoffman.
> Ms. Hoffman stated "I told you the truth as I knew it yesterday (May 20)." See Exhibit A,

p. 8, lines 24-25. (transcript from May 21, 2013 proceedings) [hereinafter Exhibit A]. Further stating "it was never said to me as bonuses, that I was thinking of it as operational funds that I had said yesterday" [Exhibit A, p. 11 lines 4-5].

Questioning of S/A Turke [p. 24, lines 1-12].

Q: "now, you mentioned that you communicated this, the fact that the police officers would get a bonus to the prosecutor on this case on Sunday, is that correct?"
A: Yes.
Q: How did that conversation come about? Did you bring it up on your own?
A: No, they brought it up to me. They asked us.
Q: Who is "they."
A: The prosecutor asked.
Q: What did she ask you?
A: She asked the cops if they get a bonus from us.
Q: In front of you?
A: Yes. I was there.
Q: And one of the cops was this officer who testified here?
A: Yes.

The court's own inquiry [p. 14, lines 1-24]:

The Court:   Are these the individuals that told you about the unit, about the payments (referring to DEA agents sitting at government table, Torbert and Martin)?
Ms. Hoffman: No.
Mr. Quinon:  Mr. Turke- what is his name?
The Court:   Excuse me. Did you two know about these payments?
S/A Torbert: Ma'am, Special Agent Michael Torbert with DEA stationed here in Miami, Florida. After the motion was made yesterday (Monday), I took it upon myself to, like you said, look into the operational expenses, at which time I discovered there was a 200 dollar operational expense that was

4

| | |
|---|---|
| | given to the SIU units. I passed that information on to Miss Hoffman and explained to her, it might be in her best interest to get some further clarification from our agents in Bogota, Colombia, as to what it is for and things of that nature. And that's where it stopped with me, ma'am. |
| The Court: | And your co-case agent? |
| S/A Martin: | Special Agent Corrine Martin, Your Honor, with DEA Miami Field Division. We inquired abou this last night and – after all of the motions and everything, we spoke with Special Agent Ed Reed this morning about it and let Miss Hoffman know this morning. |

When further pressed by the Court, Ms. Hoffman first stated that she first found out about the $200 payments on the evening of May 20, 2013. Shortly thereafter, Ms. Hoffman stated that she first found out about the $200 payments at noon on May 21, 2013 (both of which would have been after the in court hearing on the matter on Monday May 20).. The Court then inquired of DEA case agents in this case, who revealed they had informed Ms. Hoffman about the $200 payments on the evening of May 20, 2013, and the morning of May 21, 2013, respectively. Ms. Hoffman never disclosed this information to defense counsel despite the fact that she and Ms. Wood had ample opportunity to do so. There is now a lack of trust in the word of Ms. Hoffman, further demonstrated below.

Immediately thereafter, inquiry was made by the Court, defense counsel, and AUSA Cynthia Wood of DEA Special Agent Guillermo Turke (who is assigned to Bogota and has been working this case since October 2010). Mr. Turke testified that he was present at a meeting on **Sunday, May 19**, 2013 (before Docket Entry No. 456 was litigated) with AUSAs Andrea Hoffman, Cynthia Wood, Colombian National Police Officer Pacheco and others. Mr. Turke

further testified that during that meeting, the subject of the $200 payment was raised and discussed. Further, Mr. Turke testified that these types of payments have been ongoing for years to multiple individuals involved in the investigation of the instant case. Finally, Mr. Turke acknowledged that these individual groups of Colombian law enforcement officers used by DEA are in fact called "vetted units," and update the DEA on a weekly basis regarding the information obtained by wire intercepts and other investigative measures these units employ. Special Agent Turke also confirmed that there is a special financial officer in each major city in Colombia tasked with the duty of managing the payments mentioned above to individual officers of the Colombian National Police who are part of these elite, vetted units.

Thus AUSA Hoffman's statements to the court that she learned about these payments on either the evening of May 20 or the morning of May 21 are proven false by the in court representations of her own DEA agents. These 'statements' by Ms. Hoffmans are governmental misconduct.

> B. Government's Failure to Disclose *Brady* Information Regarding Alleged Buying and Selling of Testimony By Cooperating Witnesses Against Defendants

On May 3, 2013, Docket Entry No. 457 was filed by AUSA Hoffman. In that filing, which was entitled " Second Brady/Giglio/Napue Report," the government stated that it had been notified that two defendants in a related case before another judge in this district alleged that Daniel Bustos paid monies to Fabian Cruz to receive information allowing Bustos to testify

6

against Defendant Salazar Buitrago in the instant case. Bustos and Cruz are listed cooperating government witness against Defendants in the instant case. Even though the government claims that these allegations have no merit, the defense requested more information surrounding these allegations pursuant to *Brady*. AUSA Hoffman, in response, revealed that the information was brought to the government's attention via letter from one of the attorneys of the individuals making the allegation of buying and selling testimony. Undersigned counsel asked that the government produce a copy of this letter. This request was refused. On May 20, 2013, this Court, over government counsel's objection, ordered that the government produce to the defense a copy of the letter. A copy of said letter has since been produced and provided to the Court.

The letter is dated April 29, 2013 and specifically states that two individuals (who are defendants in a related case and are currently in custody) allege that there is a witness selling evidence and information that will be used against the defendants going to trial in the instant case. The attorney authoring the letter urges the government to meet with these defendants, stating his belief that such individuals would be willing to wear wire devices to substantiate their claims. The attorney further adds in the letter that his client has testified as a witness in a prior trial prosecuted in this district.

---

1. For the protection of those individuals, undersigned counsel has not named the individuals making such accusation in this pleading, and requests that, should the individuals be identified at the hearing on this motion, that such portion of the hearing be sealed.

7

**ARGUMENT**

**A. DISMISSAL BASED ON OUTRAGEOUS GOVERNMENT CONDUCT**

Defendants seek to dismiss the indictment lodged against them based on the government's outrageous conduct leading up to, and during trial. The doctrinal origins of this motion are found in the dicta of a decision authored by then-Justice Rehnquist: "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32 (1973). The *Russell* majority indicated that governmental conduct would be constitutionally impermissible only where it went beyond "that 'fundamental fairness, shocking to the universal sense of justice' mandated by the Due Process Clause of the Fifth Amendment." *Id*. (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246 (1960)). A number of courts have read the Supreme Court's warning in *Russell* to confine the broad due process check on the conduct of law enforcement officers only to that small category of cases in which the police have been brutal, employing physical or psychological coercion against the defendant. See *United States v. Kelly*, 707 F.2d 1460, 1476 n.13 (D.C. Cir. 1983) (per curiam) (citing cases) (reversing district court dismissal for outrageous conduct in government sting of public officials). The Supreme Court has consistently held that due process is offended when government conduct is so egregious that it shocks the conscience and violates the decencies of civilized conduct. *County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998) quoting *Rochin*, 342 U.S. at 172-73. According to the Supreme Court, the due process guarantees of the Constitution were intended to prevent government officials from abusing [their] power, or employing it as an instrument of oppression.

8

*Collins v. Harker Heights,* 503 U.S. 115, 126 (1992) (quoting *DeShaney v. Winnebago County Dept. of Soc. Servs.,* 489 U.S. 189, 196 (1989) and *Davidson v. Cannon,* 474 U.S. 344, 348 (1986)). The Eleventh Circuit recognized in *United States v. Edenfield*, 995 F.2d 197 (11th Cir. 1993), that even in the investigative or pre-indictment stage of a case, government misconduct could violate "that fundamental fairness, shocking to the universal sense of justice mandated by the due process clause of the fifth amendment." *Id*. at 200 (quoting *United States v. Tobias*, 662 F.2d 381, 386-87 (5th Cir. Unit B 1981) and *Russell*, 411 U.S. at 432). In order to completely bar prosecution, government misconduct must be "outrageous." *Edenfield*, 995 F.2d at 200. In evaluating the outrageousness of government misconduct, a court must look at the totality of the circumstances, with no single factor controlling. See *Tobias*, 662 F.2d at 387.

In this case, looking at the totality of the circumstances, the Court should find that, due to the outrageous government conduct present here, the Defendants have been deprived of their Constitutional right to Due Process in this case and therefore this indictment should be dismissed. First, it is evident from the email response in May, 2013 that the government had in its possession information and/or reports that would confirm that "vetted units" were used in the investigation of this case. Its refusal to turn this information over and its later dishonesty with the Court about the nature of these vetted units and payments made to them by the United States government should not be countenanced by this Court. Such flagrant disregard for the rule of law and brazen dishonesty to the Court and to opposing counsel should certainly shock the conscience of the Court. The actions of the government in this case place into question the integrity of its entire investigation. When AUSA Hoffman was confronted by the Court about when she first found out about the payments that the United States makes to CNP officers, she'd

given contradictory answers on multiple occasions until her own agents were forced by the Court's inquiry to expose her misrepresentations. This conduct is so egregious that fundamental fairness and due process mandate that this indictment be dismissed against the Defendants.

### B. MOTION FOR MISTRIAL BASED ON PROSECUTORIAL MISCONDUCT

In the alternative, should the Court not find that the government's misconduct rises to the level that a dismissal is warranted, the Defendants respectfully move for a mistrial in this case based upon prosecutorial misconduct. The decision as to whether to grant a mistrial based upon prosecutorial misconduct lies within the discretion of the trial court. *United States v. Granville*, 716 F. 2d 819, 821 (llth Cir. 1983).

In this case, the misconduct is set forth in detail above and the Defendants have been severely prejudiced by it. With respect to the failure to disclose the information about the vetted units, their cooperation with the DEA in the investigation of this case, and the payments made to these individual officers by the United States government, the Defendants were unable – until after trial began – to obtain information that would provide a good faith basis for a motion to suppress the wiretaps under a "joint venture" theory. As the Court is aware, the wire intercepts in this case are essential to the government and, had the Defendants had the information in a timely manner, they certainly would have filed a motion to suppress this evidence. It is simply too late to do so now as the jury has already heard one of the wiretaps containing a conversation between an unknown individual and Mr. Salazar Buitrago. In addition to hearing that conversation, the government chose to put on the testimony of one of the CNP officers who received payment from the United States government to opine that the call demonstrates "coded language" used by both Mr. Salazar Buitrago and the unknown speaker indicative of heavy

narcotics trafficking.  Based upon this failure by the government to be candid about this information alone, the Court should grant a mistrial.

In addition to her less than candid statements to the Court and to the defense, Ms. Hoffman repeatedly refused to turn over to the defense a letter that contained detailed *Brady* information until ordered to do so by the Court.  This letter outlined in detail serious allegations of witness tampering in this case.  Had the defense been apprised of the contents of this letter on April 29, 2013, when it was transmitted to the U.S. Attorney's Office, defense counsel could have conducted its own investigation into the allegations and not have to rely on the government's representation that these allegations are without merit.  The Court will certainly understand why assurances by the government cannot be relied upon by defense counsel.  Again, the fact that the defense did not receive this letter until after trial began is extremely prejudicial to the Defendants as it precludes our ability to sufficiently investigate the matter, and thus deprives the Defendants of their Due Process.

WHEREFORE, defendants, Jose Salalazar Buitrago and John Finkelstein Winer, respectfully request that this Court dismiss the superseding indictment based on outrageous government conduct or, in the alternative, grant their motion for mistrial.

                                     Respectfully submitted,
                                     MICHAEL CARUSO
                                     FEDERAL PUBLIC DEFENDER

BY:    s/ Kashyap P. Patel
           Kashyap P. Patel
           Assistant Federal Public Defender
           Florida Bar No. A5501373
           150 West Flagler Street
           Suite 1700
           Miami, Florida 33130-1556
           Tel:  305-530-7000/Fax:  305-536-4205
           E-Mail Address: Kashyap_Patel@fd.org

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2013, undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF and has served same via U.S. Mail to those counsel(s) who are not authorized to receive electronically Notice of Electronic Filing.

                                            s/ Kashyap P. Patel
                                            Kashyap P. Patel

# SERVICE LIST

**United States of America  v. Jose Salazar Buitrago**

**Case No.  10-20798-Cr-Cooke**

**United States District Court, Southern District of Florida**

| | |
|---|---|
| Kashyap P. Patel, AFPD | Andrea Hoffman, AUSA |
| Kashyap_Patel@fd.org | Andrea.Hoffman@usdoj.gov |
| Federal Public Defender's Office | United States Attorney's Office |
| 150 West Flagler Street | 99 N.E. 4th Street |
| Suite 1700 | Suite 600 |
| Miami, Florida 33130 | Miami, Florida 33132 |
| Telephone: 305/530-7000 | Telephone: 305/961-9000 |
| Facsimile: 305/536-4559 | Facsimile: 305/530-7976 |
| Attorney for Defendant | Attorney for United States |
| CM/ECF | CM/ECF |

J:\Salazar Buitrago, Jose H. Reg97905-004\WorkingSubDirectory\mtn to dismiss based on outrageous govt conduct or in alternative for mistrial.wpd